[912 NYS2d 53]

RONALD BRUCE POSNER, Respondent, v RUSSELL T. LEWIS et al.,
Appellants.

First Department, December 9, 2010

## APPEARANCES OF COUNSEL

*Cahill Gordon & Reindel LLP*, New York City (*Thomas J. Kavaler* and *M. Justin Lubeley* of counsel), for appellants.

*Krauss PLLC*, White Plains (*Geri S. Krauss* of counsel), and *Jonathan P. Arfa, P.C.*, White Plains (*Jonathan P. Arfa* of counsel), for respondent.

## OPINION OF THE COURT

ANDRIAS, J.

Plaintiff alleges that defendants engaged in a malicious course of conduct that resulted in the denial of his application for tenure, solely as retribution for plaintiff's refusal to accede to their demands that he relinquish all of his parental rights to his newly born daughter, and not as a genuine effort to promote any public policy concern.

Accepting these allegations as true, and according them the benefit of every favorable inference, as we must do on a motion to dismiss pursuant to CPLR 3211 (a) (7) (*see Leon v Martinez*, 84 NY2d 83, 87-88 [1994]), both the majority and dissent agree that plaintiff states causes of action to recover damages under the theories of prima facie tort and tortious interference with prospective contractual relations. Nevertheless, the dissent would dismiss the complaint under *Brandt v Winchell* (3 NY2d 628 [1958]) on the ground that defendants' communications with school officials disclosing plaintiff's affair with a coworker, who was also the mother of a child in his class, and alleging that plaintiff helped the coworker get work, were protected by the absolute privilege attending the disclosure of matters of public interest, regardless of defendants' allegedly vindictive motive. This rigid and unjustifiably narrow reading of *Brandt* fails to give weight to the countervailing public interest in deterring the use of coercive means to compel a parent to relinquish his or her parental rights, without consideration of the best interests of the child. Accordingly, the absolute privilege of *Brandt* should not attach to defendants' communications simply because of defendants' (hollow, in our view) claims of public interest.

As stated in the complaint, plaintiff was a nontenured teacher at Siwanoy Elementary School, in the Pelham Union Free

School District in Westchester County (District), where he received "superior" and "outstanding" evaluations by his principal. In March 2008, after his wife Erin, a tenured teacher, accused him of misconduct, his father-in-law, defendant Russell T. Lewis (Russell), formerly president and CEO of the New York Times Company, and his brother-in-law, defendant David Lewis (David), a Proskauer Rose attorney, told plaintiff to pack his things and leave the marital residence, which Russell owned. When plaintiff returned with his brother Daniel later that day, Russell "warned" Daniel that if plaintiff "did not go quietly," Russell would "make trouble" for plaintiff. Russell also "explicitly threatened to go to the Pelham Board of Education and impact [plaintiff's] tenure."

On March 31, 2008, plaintiff was served with papers commencing a divorce proceeding. Although Erin was represented by matrimonial counsel, David entered into a written "retainer agreement" with her in April 2008 under which he agreed to act, pro bono, as her general attorney, "includ[ing], but not . . . limited to, advising [Erin] with respect to general legal issues regarding [her] divorce."

On April 10, 2008, plaintiff's principal attended a session of the District's Board of Education (Board) at which time plaintiff was approved for tenure, to be formally acted upon at the June 2, 2008 meeting of the Board. The principal advised plaintiff of the grant of tenure by an e-mail that day. By separate e-mail, he also conveyed the tenure decision to other staff members.

Meanwhile, on April 3, 2008, Russell had told plaintiff that he wanted a "clean break" between plaintiff and Erin. It later became clear that Russell's idea of a clean break included plaintiff's relinquishing all of his parental rights with regard to his and Erin's daughter, Sydney, born March 2008, and agreeing never to see her again. When plaintiff rejected Russell's offer of a significant cash payment to do so, Russell and David, as retribution, engaged in a series of acts in furtherance of their threat to block plaintiff from obtaining tenure and to seek the revocation of his teaching license.

Towards this end, without plaintiff's knowledge or consent, defendants had Kroll Associates examine the computers in the marital residence to find plaintiff's personal and professional e-mails so that defendants could present them to the District to influence the tenure decision and to demand revocation of plaintiff's teaching license. They also retained detectives to conduct surveillance.

On April 14, 2008, in a letter to the Office of School Personnel Review and Accountability of the New York State Education Department (OSPRA) that allegedly had been initiated, reviewed and approved by Russell, David accused plaintiff of "Immoral and Fraudulent Misconduct" "requiring disciplinary action . . . including . . . the revocation of his teaching license." David, who had no connection to the District, stated that the letter was "being submitted solely on my own initiative in my individual and personal capacity as a private citizen." He did not disclose his relationship to plaintiff, that plaintiff and Erin were involved in divorce proceedings, or that Erin had retained him.

After OSPRA advised the District of the complaint, David, allegedly at Russell's urging, made several calls to the District and its superintendent "demanding to know what was going on in the investigation and what disciplinary actions were being taken."

On or about April 28, 2008, having been called in to meet with his principal and the District assistant superintendent, plaintiff was apprised of the complaint and advised that the District was required to conduct an investigation. Plaintiff told them of "the events that had transpired in his personal life," and the principal and the assistant superintendent replied that his private life was not their concern and that if a computer check came up clean they did not believe there would be any impact on his tenure. The Board was scheduled to meet the following night, April 29, 2008.

On April 29, 2008, plaintiff was told the computer check had come up clean. However, prior to the Board meeting, David, allegedly at Russell's urging, sent a letter dated April 29, 2008 to the District superintendent and all the members of the Board, including e-mail attachments and the Kroll report. David, who again failed to disclose his relationship to Erin, asserted that plaintiff and "his co-worker" had lied to the District superintendent and demanded that "the strongest of disciplinary measures" be taken, emphasizing plaintiff's nontenured status. While demanding that the Kroll report not be released to plaintiff, David consented to its use in any litigation involving the District.

On or about May 1, 2008, plaintiff was told that the District superintendent and assistant superintendent and his principal were satisfied with his answers, that they believed he had been honest with them and that there was no impediment to his

gaining tenure. He was also told that it was the Board that made the final decision, that 99% of the time it followed their recommendation, and that the Board would take a formal vote on June 2, 2008.

On or about May 6, 2008, the Board met in executive session and discussed plaintiff's tenure. On or about May 7, plaintiff was told by the superintendent and his principal that he no longer had the votes for tenure, and was given the opportunity to resign before the scheduled June 2 vote. The pressure exerted by Russell and David was allegedly the sole reason why tenure was not to be granted.

Plaintiff tendered his resignation, which was accepted by the Board by resolution at the June 2, 2008 meeting. Still, David continued to call the superintendent demanding information about the investigation. On or about June 10, 2008, David made a Freedom of Information Law request for all documents that related to plaintiff, and the District responded by providing a copy of the resolution accepting plaintiff's resignation. According to the complaint, "[a]s a result of Defendants' wrongful and malicious actions, Plaintiff Posner was and continues to be unable to secure another tenure track teaching position in a public school district in Westchester County."

To state a claim for prima facie tort, plaintiff must plead "(1) the intentional infliction of harm, (2) which results in special damages, (3) without any excuse or justification, (4) by an act or series of acts which would otherwise be lawful" (*Freihofer v Hearst Corp.*, 65 NY2d 135, 142-143 [1985]; *see also Learning Annex Holdings, LLC v Gittelman*, 48 AD3d 211 [2008]). "[T]here is no recovery in prima facie tort unless malevolence is the sole motive for defendant's otherwise lawful act or, in [other words], unless defendant acts from disinterested malevolence" (*Burns Jackson Miller Summit & Spitzer v Lindner*, 59 NY2d 314, 333 [1983] [internal quotation marks and citations omitted]).

To state a legally cognizable claim for tortious interference with prospective contract rights, the plaintiff must allege with specific factual support that the defendant directly interfered with a third party and that the defendant acted wrongfully, by the use of dishonest, unfair, or improper means, or was motivated solely by a desire to harm the plaintiff (*see Carvel Corp. v Noonan*, 3 NY3d 182, 189-192 [2004]; *Guard-Life Corp. v Parker Hardware Mfg. Corp.*, 50 NY2d 183, 189-190 [1980]; *Snyder v Sony Music Entertainment*, 252 AD2d 294, 299-300 [1999]).

These elements are undisputedly satisfied by the factual allegations set forth above and by plaintiff's allegations that:

- "[t]he sole motivation for Defendants' conduct was their admitted and avowed intent and desire to inflict maximum injury upon Plaintiff because of his refusal to accede to the demands of Defendant Russell Lewis that Plaintiff relinquish all of his parental rights to Plaintiff's newly born daughter, Sydney";

- "Each of these acts were motivated solely by malice and were done with the sole purpose and intention to punish and injure Plaintiff";

- Defendants acted "solely out of malice and in order to punish and injure Plaintiff Posner for his refusal to accede to Defendant Russell's demand that Plaintiff relinquish all of Plaintiff's parental rights to Sydney";

- David's April 14, 2008 letter "evidences that Defendant David's motive was not a genuine effort to promote any public policy concern or provide information to the District for it to act on as and if it saw fit, but rather was motivate[d] solely by malice and calculated and designed to injure Plaintiff";

- David's April 29, 2008 letter "further evidences that Defendant David's motive was not a genuine effort to promote any public policy concern or to provide information to the District for it to act on as and if it saw fit, but rather was motivated solely by malice and calculated and designed to injure Plaintiff"; and

- "As a result[ ] of Defendant's acts, Plaintiff Posner has suffered special damages, including the loss [of] his teaching position at the District and the income derived . . . therefrom, the loss of tenure at the District and the security and income to be derived therefrom, and a diminution in job prospects and future earnings in his chosen profession of teaching."

Contrary to the dissent's opinion, *Brandt v Winchell* (3 NY2d 628 [1958], *supra*) does not mandate dismissal of the complaint. In *Brandt*, which has not been cited by a New York State appellate court for more than 20 years, the plaintiff sued columnist Walter Winchell and philanthropist Elmer Bobst, alleging prima

facie tort, for maliciously instigating public officials to investigate the Cancer Welfare Fund, Inc. so that it could not compete with their Damon Runyon Memorial Fund for Cancer Research, Inc. The Court of Appeals dismissed the complaint, finding, among other things, that Winchell's lawful act of bringing charges against plaintiff before public officials did not become unlawful just because it was motivated by malevolent intent, since the best interests of the public were served by exposing plaintiff's offenses. However, in reaching this determination, the Court of Appeals cautioned that a balancing test must be applied:

> "There are situations where for one of several reasons a court is constrained to ignore the wrongful motive of the actor. For example, a court may be prompted to disregard the actor's motive by reason of the paramount consideration of the public welfare. *Accordingly, it may fairly be said that whenever the gist of an alleged cause of action (as here) is that an otherwise lawful act has become unlawful because the actor's motives were malevolent, the court is called upon to analyze and weigh the conflicting interests of the parties and of the public in order to determine which shall prevail*" (3 NY2d at 634-635 [emphasis added]).

Applying *Brandt*'s balancing test and weighing the conflicting interests of the parties and the public, we find that the circumstances before us do not warrant that defendants' communications be protected by an absolute privilege. Although there is certainly a strong public interest in preserving the integrity of our school systems, there is an equally strong public interest in deterring the use of coercion to compel a parent to relinquish his or her parental rights without consideration of the best interests of the child (*see generally Eschbach v Eschbach*, 56 NY2d 167 [1982]). In *Eschbach*, the Court of Appeals made clear that it is the policy of this State that in making custody determinations the paramount concern is the "best interest of the child, and what will best promote its welfare and happiness" (56 NY2d at 171, quoting Domestic Relations Law § 70), including the effect an award of custody to one parent might have on the child's relationship with the other parent and which parent is the more likely to assure meaningful contact between the child and the noncustodial parent. Here, without any regard for the best interests of the child, both now and in the future,

defendants allegedly sought retribution against plaintiff for refusing to give up his parental rights and terminate all contact with his daughter, which may in fact be detrimental to the child (*Beth R. v Donna M.*, 19 Misc 3d 724, 735 [2008] ["The abrupt exclusion of a parental figure may be damaging to the emotional well-being of that child"]).

Further distinguishing *Brandt* are the allegedly unlawful and independently tortious means used by defendants to accomplish their goals, which may serve as a basis for plaintiff's tortious interference with prospective contract rights claim. As detailed above, plaintiff alleges that "[u]pon his refusal to accede to Defendant Russell's demands and accept Defendant Russell's offer of a financial buy-out of Plaintiff's parental rights," defendants, "upon information and belief, conspired and acted, both individually and together, to carry through on . . . Russell's threats to interfere with the granting of tenure to . . . Posner by the District," which they accomplished by exposing plaintiff's affair with the parent of one his students, who was also a substitute teacher. An effort by defendants to coerce plaintiff into forfeiting his parental rights, if true, may very well fall within the ambit of Penal Law § 135.60 (5), which provides:

> "A person is guilty of coercion in the second degree when he or she compels or induces a person to engage in conduct which the latter has a legal right to abstain from engaging in, or to abstain from engaging in conduct in which he or she has a legal right to engage, . . . by means of instilling in him or her a fear that, if the demand is not complied with, the actor or another will: . . .

> "5. Expose a secret or publicize an asserted fact, whether true or false, tending to subject some person to hatred, contempt or ridicule."

Plaintiff further alleges that defendants employed other wrongful means in engaging in their malicious course of conduct. These include: (1) the April 14, 2008 letter states that it was submitted solely in David's "individual and personal capacity as a private citizen" but omits his relationship to plaintiff, the divorce action or his retention by his sister; (2) while David holds himself out as an expert in legal ethics, he "failed to follow the basic, published guidelines and rules for filing a complaint against a teacher" and did so "deliberately with the belief that circumventing the guidelines would expedite the

process and increase the possibility of inflicting the maximum amount of injury on Plaintiff Posner"; and (3) in his April 29, 2008 letter, David similarly concealed his true motive. Moreover, as even the dissent concedes, "the complaint arguably alleges independently tortious conduct as a result of the unauthorized invasion of a personal computer hard drive, even if that computer was located in a home owned by a defendant (Russell)."

Whatever we think of plaintiff's conduct, "adultery would not *ipso facto* warrant [the] loss of custody" (*Martin v Martin*, 74 AD2d 419, 428 [1980]). Thus, in the circumstances alleged in the complaint, to allow defendants to hide beyond the "absolute privilege" of *Brandt* at this stage of the proceeding would circumvent the very balancing test that is mandated by *Brandt*.

Nor does the *Noerr/Pennington* doctrine (*see Eastern Railroad Presidents Conference v Noerr Motor Freight, Inc.*, 365 US 127 [1961]; *Mine Workers v Pennington*, 381 US 657 [1965]) mandate dismissal at this procedural stage. Pursuant to this doctrine, "citizens who petition the government for governmental action favorable to them cannot be prosecuted under the antitrust laws" (*Alfred Weissman Real Estate v Big V Supermarkets*, 268 AD2d 101, 106-107 [2000]). Plaintiff contends that defendants sought action by the Board that, while detrimental to plaintiff, was not favorable to defendants, who had no personal interest in the outcome of the tenure determination since they did not reside in the District and did not have any children there. Thus, as the motion court found, it is far from clear that the *Noerr/ Pennington* doctrine applies here, where "the motivation for such communications was vindictive and arose from personal animus unrelated to any apparent actual concern about the operation of government." (2009 NY Slip Op 33245[U], *3.)

Accordingly, the order of the Supreme Court, New York County (Marylin G. Diamond, J.), entered November 30, 2009, which denied defendants' motion to dismiss the complaint, should be affirmed, without costs.

TOM, J.P. (dissenting). The complaint alleges that, in the attempt to pressure plaintiff to surrender his parental rights to his daughter, defendants maliciously communicated information to the Pelham school board with the result that plaintiff was denied a tenured teaching position and has since been unable to secure such position in any Westchester County school district. I would find that the action taken by the school board was the consequence of wrongful conduct by plaintiff that was inimical

to the public and that defendants' exposure of such misconduct was privileged because it advanced the public interest.

As recounted in the complaint, plaintiff married Erin Lewis Posner, the daughter of defendant Russell T. Lewis, on July 23, 2005, and the couple took up residence in Armonk, New York, in a house owned by Russell. After receiving his Master's degree in early childhood education, plaintiff was employed as a nontenured teacher by the Pelham Union Free School District in Westchester County. Erin is also a school teacher, employed by the Chappaqua school district, and was granted tenure in May 2007. Plaintiff received high evaluations for his work with the Pelham school district and became eligible for tenure in June 2008.

Erin gave birth to a baby girl in March 2008 and returned home with her daughter, Sydney, two days later. On March 28, plaintiff arrived home to find his father-in-law at the house. Based on information of plaintiff's alleged misconduct that he had received from his daughter, Russell told plaintiff to pack his things and leave, which plaintiff did. When plaintiff, accompanied by his brother, Daniel, returned to the house later in the day to pick up a few more belongings, Russell told Daniel that if plaintiff "did not go quietly," he, Russell, would "make trouble," explicitly threatening to contact the Pelham Board of Education and "impact" plaintiff's tenure. Plaintiff was served with divorce papers on March 31, 2008.

In early April 2008, Russell arranged a meeting, at which he informed plaintiff that he wanted a "clean break" between plaintiff and his daughter. It subsequently became clear that Russell intended that plaintiff would relinquish all parental rights to Sydney and agree never to see his child again. To that end, Russell promised plaintiff a substantial cash payment to secure his compliance. Plaintiff refused.

It is alleged on information and belief that plaintiff was approved for tenure at an executive session of the Pelham School District Board of Education on April 10, 2008, subject to formal action at a meeting of the board to be held on June 2. Plaintiff received a congratulatory e-mail from the elementary school principal shortly thereafter. It is further alleged that defendants retained the firm of Kroll Associates to examine the hard drives of plaintiff's personal computers to recover his personal and professional e-mails and that they retained other persons or businesses to conduct surveillance of plaintiff and report on his activities. In addition, although Erin was represented by well-

reputed matrimonial counsel, her brother, defendant David Lewis, entered into a retainer agreement dated April 11, 2008 to act on Erin's behalf "with respect to vendors and other third-parties . . . All of this communication will be subject to the Attorney-client privilege and work product doctrine to the maximum extent allowed by law."

The complaint alleges that defendants then conspired to prevent plaintiff from being granted tenure by the Pelham school district. David sent a letter dated April 14, 2008 to the New York State Education Department Office of School Personnel Review and Accountability (OSPRA) complaining of plaintiff's "immoral behavior," specifically, "carrying on a long-term immoral adulterous relationship with the parent of a child in Mr. Posner's class. Compounding matters, this parent is also a substitute teacher (recently for Mr. Posner's class)." The letter included the text of personal e-mails between plaintiff and the substitute teacher recovered from plaintiff's computer. The letter also stated that plaintiff lied on his resume in violation of the National Education Association code by omitting a pre-teaching employment position that was abruptly terminated. David represented that he was writing "as a private citizen pursuant to The Regulations of the Commissioner of Education Part 83, Section 83.1 (c)," which provides that "[i]nformation in the possession of any person indicating that an individual holding a teaching certificate . . . has committed an act which raises a reasonable question as to the individual's moral character[ ] may be referred to the professional conduct officer of the department." (8 NYCRR 83.1 [c].) David alleged that plaintiff's "misconduct involves a clear nexus between the immoral behavior of this teacher and his fitness to teach." David argued that plaintiff's promotion of his paramour as a substitute teacher "had the effect of ingratiating [her] to Mr. Posner at the financial and educational expense of the Pelham Union Free School District" and "compromised [plaintiff's] objectivity in the classroom." David later provided the report from Kroll On-track, described as a subsidiary of Kroll Associates and "a worldwide leader in the area of computer forensic investigations," to both OSPRA and the superintendent of the school district. This correspondence, like his former letter, demanded disciplinary action. It is also asserted on information and belief that David, with the consent and inducement of Russell, made a series of telephone calls to officials in the school district, including its superintendent, demanding to know the status of the

investigation into his complaint and what disciplinary action was being taken.

About May 1, 2008, plaintiff met with the principal of his school and the district superintendent and assistant superintendent. On May 6, the school board met in executive session. The following day, plaintiff was informed that he no longer had enough support to obtain tenure and was given the opportunity to resign before the board's scheduled vote on June 2. As a result, plaintiff tendered his resignation. David made a Freedom of Information Law request for documents relating to plaintiff and obtained a copy of the June 2, 2008 resolution of the school board accepting plaintiff's resignation.

The complaint alleges that, solely as a result of the pressure brought to bear by defendants, plaintiff was denied the tenured teaching position that the board had approved at the executive session on April 10, 2008 and that, as a consequence, he continues to be unable to obtain a tenured teaching position with a public school district in Westchester County. The complaint seeks $3.5 million in compensatory and $10 million in punitive damages for tortious interference with a prospective contractual relation, asserting that defendants acted with malice and without excuse or justification, proximately causing the school district to deny plaintiff tenure and resulting in the termination of his employment.

The complaint seeks the same damages for prima facie tort, alleging that defendants were solely motivated by a malicious intent to injure plaintiff, without excuse or justification. The loss of his job, loss of tenure and diminution in job prospects and future earnings are listed as special damages. However, plaintiff does not claim that the information defendants communicated to the board was false.

Defendants interposed this pre-answer motion to dismiss the complaint for failure to state a cause of action (CPLR 3211 [a] [7]), contending that their letters and other communications to the school officials were privileged as matters of public concern. Supreme Court denied the motion, holding that defendants failed to establish, as a matter of law, that the information they reported was in the public interest so as to qualify for absolute privilege under *Brandt v Winchell* (3 NY2d 628 [1958]). The court further rejected defendants' contention that the communications were protected by the First Amendment under the *Noerr/Pennington* doctrine absent a clear showing that they were of bona fide governmental interest (*see Eastern Railroad*

*Presidents Conference v Noerr Motor Freight, Inc.*, 365 US 127 [1961]; *Mine Workers v Pennington*, 381 US 657 [1965]). The court noted that David was not a resident of the school district, concluding that "the motivation for such communications was vindictive and arose from personal animus unrelated to any apparent actual concern about the operation of government." (2009 NY Slip Op 33245[U], *3.) Finally, although the complaint fails to allege that Russell undertook any actionable conduct, the court found his alleged threat to make trouble and his asserted complicity with David sufficient to sustain the complaint as against him.

While the causes of action are adequately pleaded, the complaint is barred by absolute privilege. As a nontenured teacher lacking enforceable contractual rights, plaintiff is obliged to make out a prima facie case of tortious interference with prospective contractual relations. This cause of action requires more culpable conduct than tortious interference with contract, such as criminal or independently tortious acts, or action taken for the sole purpose of inflicting intentional harm (*see Carvel Corp. v Noonan*, 3 NY3d 182, 189-192 [2004]; *Perry v Collegis, Inc.*, 55 AD3d 459 [2008]). The complaint plainly alleges conduct undertaken for the sole purpose of inflicting injury, and the cause of action is adequately pleaded on this basis alone. Further, the complaint arguably alleges independently tortious conduct as a result of the unauthorized invasion of a personal computer hard drive, even if that computer was located in a home owned by a defendant (Russell).

With respect to prima facie tort, the complaint sufficiently pleads malice or "disinterested malevolence" (*see Learning Annex Holdings, LLC v Gittelman*, 48 AD3d 211, 212 [2008] [internal quotation marks and citations omitted]; *Golub v Esquire Publ.*, 124 AD2d 528, 529 [1986], *lv denied* 69 NY2d 606 [1987]). Although claims of malice are repeated in conclusory fashion in the complaint, the cause of action does not fail for insufficiency because the entire tenor of the complaint is that defendants were vengeful over the injury to Erin caused by plaintiff's affair, which supplies the requisite supporting factual allegations (*cf. WFB Telecom. v NYNEX Corp.*, 188 AD2d 257, 258-259 [1992], *lv denied* 81 NY2d 709 [1993]; *Turner Constr. Co. v Seaboard Sur. Co.*, 98 AD2d 88, 91-92 [1983]).

However, the communications with school officials are protected by absolute privilege under *Brandt v Winchell* (3 NY2d 628 [1958], *supra*). There, the plaintiff, who ran a charitable

fund, brought an action for prima facie tort, alleging that the defendants, who were principals in a competing charitable fund, sought to put an end to his fund and its charitable endeavors by making false and wanton accusations against him to law enforcement officials, thereby prompting baseless and harassing investigations. Despite their allegedly reprehensible motives, the Court of Appeals held that the defendants were immune from suit, noting that prima facie tort is an innovation that makes actionable what is otherwise a lawful act when undertaken solely out of malice and ill will to injure another. Enunciating a policy decision, the Court weighed the conflicting interests of the parties and the public, choosing to ignore the wrongful motive and "vindictive spirit" of the actors and their "malicious instigation of official action" in favor of the paramount consideration of the public welfare (3 NY2d at 635). The Court reasoned:

> "The best interests of the public are advanced by the exposure of those guilty of offenses against the public and by the unfettered dissemination of the truth about such wrongdoers. Such a person is entitled to *immunity* from civil suit at the hands of the one exposed, for the truth is not to be shackled by fear of a civil action for damages" (*id*. [emphasis added]).

Unlike defamation, where absolute privilege in judicial proceedings depends on "the personal position or status of the [actor] and is limited to [his] official participation in the processes of government" (*Park Knoll Assoc. v Schmidt*, 59 NY2d 205, 209 [1983]), *Brandt* treats the privilege as *absolute* (conferring "immunity"), irrespective of the status of the actor. Contrary to plaintiff's contention, subsequent cases do not limit the privilege to judicial and quasi-judicial proceedings. The privilege exists to promote public welfare, not public officials, and has been extended where required to insulate against "the harassment and financial hazards that may accompany suits for damages by the victims of even malicious libels or slanders" (*Stukuls v State of New York*, 42 NY2d 272, 278 [1977]). The privilege continues to be extended to "circumstances where allegations of possible wrongdoing are acted upon by government agencies" (*ATI, Inc. v Ruder & Finn*, 42 NY2d 454, 460 [1977]). Nor is discovery required to assess whether the information communicated by defendants was pertinent to the school board's determination, as Supreme Court reasoned. Whether informa-

tion is pertinent presents a question of law, "properly determinable on a motion to dismiss addressed to the pleadings and documentary evidence alone" (*Sexter & Warmflash, P.C. v Margrabe*, 38 AD3d 163, 173 [2007]). Significantly, the test of pertinence is "extremely liberal" (*id.*).

The information conveyed by defendants herein was a matter affecting the public interest. It is beyond cavil that a plaintiff's adulterous relationship with the parent of a child in his class raises a reasonable question as to his moral character and warrants referral to the Education Department under Regulations of the Commissioner of Education (8 NYCRR) § 83.1 (c). This conduct may have a negative impact on students by leading to favoritism or by affecting their moral perceptions. Plaintiff's influencing school officials to hire his paramour as a substitute teacher may adversely affect the students if she is not as qualified as others. The use of school computer equipment for the lovers' private e-mails affects the public fisc. Plaintiff's conscious omission from his resume of a prior employment from which he was abruptly terminated may have affected his hiring and reflects adversely on his honesty in general. Nor does the regulation in any way restrict the source of such information to persons residing within the affected school district. Finally, the action resulting in injury to plaintiff was the result of the school board's decision to deny him tenure, the propriety of which has not been challenged in the appropriate proceeding pursuant to CPLR article 78 and is not before us.

Accordingly, the order should be reversed, and the motion granted.

NARDELLI and RENWICK, JJ., concur with ANDRIAS, J.; TOM, J.P., and ROMÁN, J., dissent in a separate opinion by TOM, J.P.

Order, Supreme Court, New York County, entered November 30, 2009, affirmed, without costs.