[965 NE2d 949, 942 NYS2d 447]

RONALD BRUCE POSNER, Respondent, v RUSSELL T. LEWIS et al., Appellants.

Argued January 4, 2012; decided February 21, 2012

**POINTS OF COUNSEL**

*Cahill Gordon & Reindel LLP*, New York City (*Thomas J. Kavaler* and *M. Justin Lubeley* of counsel), for appellants. Respondent's claims sounding in prima facie tort and tortious interference must be dismissed because they are premised entirely and exclusively on privileged and protected speech. (*Brandt v Winchell*, 3 NY2d 628; *ATI, Inc. v Ruder & Finn*, 42 NY2d 454; *Weissman v Mogol*, 118 Misc 2d 911; *New York Times Co. v Sullivan*, 376 US 254; *Prozeralik v Capital Cities Communications*, 82 NY2d 466; *Chapadeau v Utica Observer-Dispatch*, 38 NY2d 196; *Carlton v Nassau County Police Dept.*, 306 AD2d 365; *Curiano v Suozzi*, 63 NY2d 113.)

*Krauss PLLC*, White Plains (*Geri S. Krauss* of counsel), and *Jonathan P. Arfa, P.C.* (*Jonathan P. Arfa* of counsel), for respondent. I. The court below properly held that defendants' statements and actions were not "absolutely privileged." (*Toker v Pollak*, 44 NY2d 211; *Park Knoll Assoc. v Schmidt*, 59 NY2d 205; *Clark v McGee*, 49 NY2d 613; *Stukuls v State of New York*, 42 NY2d 272; *Andrews v Gardiner*, 224 NY 440; *ATI, Inc. v Ruder & Finn*, 42 NY2d 454; *Penn-Ohio Steel Corp. v Allis-Chalmers Mfg. Co.*, 7 AD2d 441; *Holy Spirit Assn. for Unification of World Christianity v New York State Congress of Parents & Teachers*, 95 Misc 2d 548; *Brandt v Winchell*, 3 NY2d 628; *Mejia v City of New York*, 119 F Supp 2d 232.) II. Decisions of this Court subsequent to *Brandt* have imposed further limitations on absolute immunity which bar its application here. (*Brandt v Winchell*, 3 NY2d 628; *Park Knoll Assoc. v Schmidt*,

59 NY2d 205; *Toker v Pollak*, 44 NY2d 211; *Weissman v Mogol*, 118 Misc 2d 911; *Garson v Hendlin*, 141 AD2d 55; *Dunajewski v Bellmore-Merrick Cent. High School Dist.*, 138 AD2d 557.) III. Defendants' activities are not protected by the First Amendment. (*Bill Johnson's Restaurants, Inc. v NLRB*, 461 US 731; *Herbert v Lando*, 441 US 153; *Branzburg v Hayes*, 408 US 665.)

**OPINION OF THE COURT**

GRAFFEO, J.

In this tort action, we must decide whether defendants' course of conduct in instigating complaints to school authorities against plaintiff, a nontenured teacher, is entitled to an absolute privilege under *Brandt v Winchell* (3 NY2d 628 [1958]) that would warrant dismissal of plaintiff's causes of action for prima facie tort and tortious interference with prospective contractual rights. Assuming the truth of the allegations in the complaint, as we must at this early stage of the litigation, we conclude that defendants' conduct is not immunized by *Brandt*.

On a CPLR 3211 motion to dismiss, we are obligated to give the complaint a liberal construction and accept the allegations as true. Providing plaintiff Ronald Posner with every favorable inference, the facts gleaned from the complaint are as follows. Beginning in 2005, Posner was employed by the Pelham Union Free School District in Westchester County as a nontenured elementary school teacher. In March 2008, after Posner's wife accused him of having an extramarital affair, his father-in-law, defendant Russell Lewis (the former CEO of the New York Times Company), instructed Posner to leave the marital residence, which Russell owned. When Posner returned to retrieve personal items, Russell warned that if he "did not go quietly," Russell would "make trouble" for him. Three days later, Posner's wife commenced a divorce proceeding.

In early April 2008, Russell informed Posner that he wanted him to make a "clean break" from his wife. It later became evident that Russell wanted his son-in-law to relinquish all parental rights to his newborn daughter. To entice the acceptance of his proposal, Russell offered Posner a sum of money and "threatened to go to the Pelham Board of Education and impact his tenure." When Posner refused, Russell and Posner's brother-in-law, defendant David Lewis (an attorney), engaged in conduct designed to effectuate the denial of Posner's tenure and the revocation of his teaching license.

In April 2008, the principal at the school where Posner taught informed him that the board of education was favorably inclined

to approve him for tenure status but that the decision would not be made formally until a June board meeting. Meanwhile, the Lewises retained a company specializing in forensic computer investigations to search for Posner's e-mails on his home computer. David then sent a letter dated April 14, 2008 to the State Department of Education accusing Posner of having an affair with the parent of one of his students, who was also recommended by Posner to be a substitute teacher in his class. David demanded disciplinary action, including revocation of Posner's teaching license. The letter referenced segments of the e-mails between Posner and his alleged paramour. After the Department of Education informed the school district about the complaint, David telephoned the school district superintendent "demanding to know what was going on in the investigation and what disciplinary actions were being taken."

Toward the end of April, the principal notified Posner that the school district was required to investigate the complaint but assured him that his private life should not affect his application for tenure. Shortly thereafter, David sent a second letter to the superintendent and each member of the board of education with a copy of a report prepared by the computer firm and Posner's e-mails. The letter urged school officials to "take the strongest measure of disciplinary action" against Posner. After a May 2008 board meeting, Posner was advised that he no longer had sufficient votes for tenure, causing him to tender his resignation before the final June vote.

Posner commenced this action against defendants asserting causes of action for prima facie tort and tortious interference with prospective contractual relations. The complaint alleges that Posner was not granted tenure because of the continuous pressure and influence exerted upon school officials by defendants and that, as a result of their "wrongful and malicious actions, Plaintiff Posner was and continues to be unable to secure another tenure track teaching position in a public school district in Westchester County."

Defendants moved to dismiss the complaint pursuant to CPLR 3211, arguing that their disclosure of Posner's affair to school officials was a matter of public interest and that they were immune from liability similar to the defendants in *Brandt*. Supreme Court denied the motion (2009 NY Slip Op 33245[U] [2009]) and a divided Appellate Division affirmed (80 AD3d 308 [1st Dept 2010]). The Appellate Division granted defendants leave to appeal on a certified question, and we now affirm.

Defendants contend that Posner's claims for prima facie tort and tortious interference with prospective contract rights should be dismissed because their exposure of his misconduct to school authorities was in the public interest and hence absolutely privileged. They assert that under *Brandt* they are immune from civil liability for instigating official action against Posner, regardless of whether they possessed a malicious intent. Posner responds that defendants are not entitled to an absolute privilege because their communications to school officials, even if related to matters of public concern, were made in connection with a coercive scheme to deprive Posner of his parental rights.

To begin, defendants do not dispute for purposes of this appeal that, absent the application of immunity recognized in *Brandt*, the complaint would adequately plead causes of action for prima facie tort[1] and tortious interference with prospective contractual relations.[2] The outcome of this case therefore turns on whether *Brandt* mandates dismissal of the action.

In *Brandt*, the plaintiff brought a prima facie tort claim against columnist Walter Winchell and philanthropist Elmer Bobst for maliciously provoking an official investigation against a cancer fund organized by plaintiff in order to stifle competition with defendants' cancer research fund. Following an investigation by the Attorney General, plaintiff agreed to dissolve the fund and refrain from any future solicitation of charitable contributions. We affirmed the dismissal of the complaint, applying a balancing test for claims alleging that a lawful act (the making of a complaint) became unlawful as a result of the complaining party's malicious motives—we "analyze[d] and weigh[ed] the conflicting interests of the parties and of the pub-

---

1. To state a legally cognizable claim for prima facie tort, a plaintiff must allege "(1) the intentional infliction of harm, (2) which results in special damages, (3) without any excuse or justification, (4) by an act or series of acts which would otherwise be lawful" (*Freihofer v Hearst Corp.*, 65 NY2d 135, 142-143 [1985]). In addition, there can be no recovery under this theory "unless malevolence is the sole motive for defendant's otherwise lawful act or, in [other words], unless defendant acts from disinterested malevolence" (*Burns Jackson Miller Summit & Spitzer v Lindner*, 59 NY2d 314, 333 [1983] [internal quotation marks and citations omitted]).

2. To state a cause of action for tortious interference with prospective contractual relations, a plaintiff must plead that the defendant directly interfered with a third party and that the defendant either employed wrongful means or acted "for the sole purpose of inflicting intentional harm on plaintiff[ ]" (*Carvel Corp. v Noonan*, 3 NY3d 182, 190 [2004] [internal quotation marks and citation omitted]).

lic in order to determine which shall prevail" (3 NY2d at 634-635).

We concluded in *Brandt* that defendants' lawful act of initiating charges related to plaintiff's mishandling of the charitable fund did not become actionable because it was motivated by personal malevolence, reasoning that "[t]he best interests of the public are advanced by the exposure of those guilty of offenses against the public and by the unfettered dissemination of the truth about such wrongdoers" (*id.* at 635). Under these circumstances, the *Brandt* defendants were "entitled to immunity from civil suit at the hands of the one exposed, for the truth is not to be shackled by fear of a civil action for damages" (*id.*; *see also ATI, Inc. v Ruder & Finn*, 42 NY2d 454, 460 [1977] ["(S)ince use of plaintiff's product may be injurious, that perhaps some defendants were motivated to harm plaintiff by alerting the public as to the potential hazard does not require a conclusion that these defendants' conduct is without justification"]).

There are some similarities between *Brandt* and this case. As in *Brandt*, defendants reported misconduct to the relevant authorities and prompted an official investigation regarding a matter of public interest. And like *Brandt*, defendants were allegedly motivated not by a desire to benefit the public but to harm the target of their animosity for personal reasons. But, as the Appellate Division majority noted, there is a critical distinction between the two cases. Accepting the allegations of the complaint to be true, defendants in this case did more than instigate an inquiry or investigation. According to Posner, Russell attempted to coerce him into relinquishing his parental rights by offering him money and threatening to reveal certain information to school authorities to ensure that he was denied tenure. And when Posner refused to accede to this demand, defendants made good on the threat. Posner's complaint therefore does not merely allege a malicious motive; rather, it asserts what is in essence a blackmail scheme. Contrary to defendants' position, their complaints to school officials cannot be isolated from this coercive scheme, which "constituted a single and integrated course of conduct" (*Giboney v Empire Storage & Ice Co.*, 336 US 490, 498 [1949] ["(T)he record here does not permit this publicizing to be treated in isolation"]). In light of the intimidation and threatening conduct allegedly directed at Posner, we conclude that the absolute privilege articulated in *Brandt* should not be extended to protect the course of conduct alleged in this case.

Although the concurrence claims that our focus is on defendants' motives, in fact, the dispositive allegation that places this case outside of the realm of *Brandt* and the other cases cited by the concurring opinion is an affirmative act—defendants' conduct in attempting to blackmail Posner.[3] As we have explained, the publicizing that occurred in this case cannot be neatly separated from this coercive scheme. To the extent defendants claim that the conduct alleged here is entitled to immunity under the First Amendment, we note that it has been consistently held that blackmail and extortion are not protected speech (*see R.A.V. v St. Paul*, 505 US 377, 420 [1992, Stevens, J., concurring] ["Although the First Amendment broadly protects 'speech,' it does not protect the right to . . . extort" (internal quotation marks and citation omitted)]; *Planned Parenthood of Columbia/Willamette, Inc. v American Coalition of Life Activists*, 244 F3d 1007, 1015 n 8 [9th Cir 2001] ["Blackmail and extortion—the threat that the speaker will say or do something unpleasant unless you take, or refrain from taking, certain actions—are not constitutionally protected"], *rehearing en banc* 290 F3d 1058 [9th Cir 2002]).[4]

Accordingly, the order of the Appellate Division should be affirmed, with costs. The certified question should be answered in the affirmative.

SMITH, J. (concurring). I agree with the result reached by the majority, but not with its reasoning. I believe the privilege recognized in *Brandt v Winchell* (3 NY2d 628 [1958]) is absolute, and not subject to a case-by-case balancing of conflicting

---

3. Defendants and the concurrence rely on *ATI, Inc. v Ruder & Finn* (42 NY2d 454 [1977]) in asserting that *Brandt* protects blackmailers. But *ATI* does not sweep so broadly. The public relations firm in *ATI* suggested that plaintiff would be adversely affected by federal and public entities if it did not retain its services to tell plaintiff's side of the story in the public debate about the environmental dangers of plaintiff's aerosol products. Although the plaintiff in *ATI* characterized defendant's actions as intimidation tactics, this is a far cry from the blackmail scheme alleged in the complaint here.

4. There is authority for the proposition that although blackmail is not constitutionally protected, a plaintiff seeking to recover reputational damages (as opposed to economic damages) flowing from the subsequent publication must satisfy the applicable defamation standard—notably, falsity—even where the plaintiff relies on non-defamation tort theories (*see Smithfield Foods, Inc. v United Food & Commercial Workers Intl. Union*, 585 F Supp 2d 815, 822 [ED Va 2008]). The parties here have not addressed the *Smithfield* analysis nor have they litigated the issue of whether the complaint in this case seeks reputational or economic damages. We therefore have no occasion to address these issues.

interests, even where, as here, "a blackmail scheme" (majority op at 571) is alleged. I conclude, however, that the communications that are the basis for this action are outside the scope of the privilege recognized in *Brandt*, not because of the motive behind them, but because they did not involve either a matter of public concern or an accusation of serious criminal conduct.

I begin this opinion by explaining why I believe that neither a balancing test nor an exception for blackmailers is consistent with the *Brandt* privilege as we have described it. I then examine the relationship between the *Brandt* rule and the rules developed in *New York Times Co. v Sullivan* (376 US 254 [1964]) and later cases; that relationship strengthens my conclusion that case-by-case balancing is the wrong approach, and that even speech motivated by blackmail is protected. Finally, I explain why I think this plaintiff's complaint should not be dismissed.

## I

*Brandt* recognized an "immunity from civil suit" for truthful communications resulting in "the exposure of those guilty of offenses against the public" (3 NY2d at 635). The plaintiff in *Brandt* was the organizer of an agency that collected funds for needy victims of cancer. Defendant Winchell, a well-known reporter and commentator, was active on behalf of a cancer research organization. The plaintiff's claim was that Winchell and his codefendants, seeking to eliminate competition from the plaintiff's group, had persuaded public agencies, including the New York Attorney General and a District Attorney, to investigate and prosecute the plaintiff and take other action against him, and had accused the plaintiff of wrongdoing in print and on the radio.

In affirming a judgment dismissing the *Brandt* complaint, we made clear that the "immunity" we recognized was absolute, and did not depend on how bad the defendant's motive was. We said:

> "If the one who sets the agencies in motion is actuated by an evil motive he may perhaps be subject to judgment in the forum of morals but he is free from liability in a court of law." (*Id.* at 635.)

We explained that such an ill-motivated party "is entitled to immunity from civil suit at the hands of the one exposed, for the truth is not to be shackled by fear of a civil action for damages" (*id.*).

We applied the rule of *Brandt* in *ATI, Inc. v Ruder & Finn* (42 NY2d 454, 456 [1977]), where the plaintiff, a manufacturer and packager of aerosol products, claimed that the defendants, an advertising agency and individuals connected with it, had set out "to intimidate" plaintiff into retaining the agency's services by publicizing the theory that aerosols were linked to the destruction of the earth's ozone layer. Again, we made clear that the immorality of defendant's alleged conduct was irrelevant: "However morally reprehensible the asserted conduct of some of the defendants may be considered to be, it is not actionable in the courts" (*id.*).

The majority says that we applied "a balancing test" in *Brandt* (majority op at 570). But the whole point of *Brandt* and *ATI* is vitiated, it seems to me—and the words I have quoted from those cases lose their meaning—if the defendant's moral culpability is to be balanced in each case against the public interest served. If such a balancing test exists the result of each case will be unpredictable and, to use the words of *Brandt*, the "fear of a civil action for damages" will not be eliminated; thus "the truth" will "be shackled." The *Brandt* rule, to have its proper effect, must protect even blackmailers, and *ATI* holds that it does: the public relations firm in *ATI* had written a letter to the plaintiff that, in the plaintiff's interpretation, was a threat to ruin the plaintiff's business if the plaintiff did not retain the firm, but the firm's communications were still privileged.

The majority finds a balancing test in the following sentence from *Brandt*:

> "Accordingly, it may fairly be said that whenever the gist of an alleged cause of action (as here) is that an otherwise lawful act has become unlawful because the actor's motives were malevolent, the court is called upon to analyze and weigh the conflicting interests of the parties and of the public in order to determine which shall prevail." (3 NY2d at 634-635.)

I think the majority reads this passage out of context. In light of the clear language in *Brandt* creating an absolute privilege, the quoted sentence should not be read to require balancing *in each case* of "the conflicting interests of the parties and of the public." Rather, I think the *Brandt* court spoke of analyzing and weighing conflicting interests to describe the process it went through in deciding to adopt a rule of absolute immunity.

The balancing was done in *Brandt*, once and for all, and is not to be repeated in every case.

## II

The privilege for truthful communications recognized in *Brandt* and *ATI* overlaps with—may, indeed, be subsumed by— the privilege or privileges for communications believed to be truthful recognized in the line of cases that begins with *New York Times Co. v Sullivan*. *New York Times* recognized a constitutionally-based rule "that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made . . . with knowledge that it was false or with reckless disregard of whether it was false or not" (376 US at 279-280). In *Gertz v Robert Welch, Inc.* (418 US 323, 347 [1974]) the Court held that more limited, but significant, protection was available "for a publisher or broadcaster of defamatory falsehood injurious to a private individual"; in such cases, the Constitution prohibits imposition of "liability without fault"—i.e., liability imposed on someone not at least negligent in believing the "defamatory falsehood" to be true. And in *Chapadeau v Utica Observer-Dispatch* (38 NY2d 196, 199 [1975]), acting "within the limits imposed" by *Gertz*, we chose to give somewhat broader protection than *Gertz* required. We held that a defamed party could recover only by showing "that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties" (*id.*).

*New York Times*, *Gertz* and *Chapadeau* all involved statements that were, or were alleged to be, false. The parties making those false statements were held to be protected from liability as long as they did not know, and were not sufficiently at fault in failing to know, that what they said was not true. It follows a fortiori that a party making a statement that *is* true must receive immunity under *New York Times*, *Gertz* and *Chapadeau*. In *Garrison v Louisiana* (379 US 64, 73 [1964]), the United States Supreme Court recognized the obvious point that truth is entitled to no less protection than falsity. The Court expressed agreement with what a state court had said more than a century before:

"If upon a lawful occasion for making a publication, he has published the truth, and no more, there is no

sound principle which can make him liable, even if he was actuated by express malice. . . .

"It has been said that it is lawful to publish truth from good motives, and for justifiable ends. But this rule is too narrow. If there is a lawful occasion—a legal right to make a publication—and the matter true, the end is justifiable, and that, in such case, must be sufficient." (*State v Burnham*, 9 NH 34, 42-43 [1837], quoted in *Garrison*, 379 US at 73; *see also Philadelphia Newspapers, Inc. v Hepps*, 475 US 767, 776 [1986] [requiring a plaintiff to bear the burden of proving that the statements at issue are false].)

I believe the results in both *Brandt* and *ATI* would have been compelled by the line of cases derived from *New York Times* that I have just summarized. Indeed, it is not clear to me that the rule of *Brandt* protects anything that the *New York Times* line of cases does not protect (though it may—I will discuss this question below). No one, so far as I know, has suggested that the protection afforded by *New York Times* and later cases can be eliminated by the sort of "balancing" the majority does here—one that takes into account the defendant's evil motive. On the contrary, under *New York Times* and related cases, the only "malice" that is relevant is knowledge of, or indifference to, the falsity of one's utterances. If the utterances are not in fact false, the motive of the speaker, as *Garrison* held, is irrelevant.

The majority opinion here disavows any "focus on defendants' motives" (majority op at 572); but in fact the alleged motive for defendants' communications is the majority's only basis for finding the *Brandt* privilege inapplicable. Plaintiff's claim is that defendants disclosed his adultery and other misdeeds *because* he rejected their demand that he surrender rights to his child. Motive, and motive only, links those disclosures to the alleged blackmail scheme the majority relies on. Defendants' letters and telephone call to the Department of Education and the school district were not blackmailing in themselves; if they were, I agree with the majority that they would be outside constitutional protections (*see Watts v United States*, 394 US 705, 707 [1969]).

In short, the majority today holds that motive may defeat the *Brandt* privilege. The result is that *Brandt* offers less protection than the United States Constitution requires.

## III

I nevertheless agree with the majority's result in this case: Plaintiff's claim is not barred. I reach this result not by balancing, but by concluding that the communications at issue here—quite apart from the alleged blackmail scheme that motivated them—are not of the kind to which the cases I have discussed are applicable.

Defendants rely primarily on *Brandt* and *ATI*. They cite *New York Times*, *Garrison*, *Chapadeau* and other related cases to bolster their argument, but never clearly argue that the *New York Times* line of cases is controlling here. They are wise to avoid that argument, because the protections that cases following *New York Times* afford against civil liability are unavailable where the statements in issue "do not involve matters of public concern" (*Dun & Bradstreet, Inc. v Greenmoss Builders, Inc.*, 472 US 749, 751 [1985]). The subject of the communications at issue here—principally, plaintiff's adulterous affair with a fellow teacher—was not a matter of "public concern" in the relevant sense.

Defendants insist that the affair, and the other topics covered in defendants' communications with the Department of Education and the school district, were of interest to the public, because plaintiff was a public employee. I agree that the school district, as plaintiff's employer, could reasonably be interested in knowing the things that defendants told it. Like any other employer, a school district can legitimately consider facts that bear on its employee's character or judgment. It might think that a man who cheated on his pregnant wife set a poor example for the students; it could certainly conclude that plaintiff acted unprofessionally in choosing for his romantic partner a fellow employee whose child was in his class; and it might be distressed to know of another fact mentioned in defendants' communications—that the resume plaintiff had submitted to the school district failed to mention a previous employment that had "terminated abruptly."

But not every fact about a public employee that his employer might want to know is a matter of "public concern" under the *Dun & Bradstreet* limitation on the *New York Times* line of cases. That line of cases is designed to protect debate about public issues (*see Garrison*, 379 US at 73 ["Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred"];

*Hustler Magazine, Inc. v Falwell*, 485 US 46, 53 [1988] ["in the world of debate about public affairs, many things done with motives that are less than admirable are protected by the First Amendment"]; *Prozeralik v Capital Cities Communications*, 82 NY2d 466, 474 [1993] [the *New York Times* "rule was promulgated in recognition 'of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open' " (quoting *New York Times*, 376 US at 270)]). As we put it in *Chapadeau*, a matter "within the sphere of legitimate public concern" is one "which is reasonably related to matters warranting public exposition" (38 NY2d at 199). Or, as Supreme Court said in *San Diego v Roe* (543 US 77, 83-84 [2004]): "public concern is something that is a subject of legitimate news interest."

Nothing in this record suggests that the matters discussed in the communications at issue in this case were, or were likely to become, the subject of public debate. Who plaintiff slept with and how complete his resume was were not matters "warranting public exposition" or "of legitimate news interest." The communications at issue therefore did not address a matter of "public concern" (cf. *Connick v Myers*, 461 US 138, 146-149 [1983] [holding a public employee's comments on the trustworthiness of her supervisors and the level of office morale not to be a matter of "public concern"]).

For these reasons, I conclude that the *New York Times* line of cases does not apply here. It is possible, as I suggested above, that *Brandt* is no more than a forerunner of those cases, and that the *Brandt* privilege is now subsumed within the later cases—and if that is so, I can end my opinion here. *Brandt* and *ATI* can plausibly be read as designed to protect only communications on matters of public concern. The communications involved in those cases were clearly in that category: *Brandt* involved a topic discussed "in nationally circulated printed publications and in nationally broadcast radio programs" (3 NY2d at 632), and *ATI* involved the threatened destruction of the ozone layer.

But it is also possible to interpret the *Brandt* privilege more broadly, as protecting "the exposure of those guilty of offenses against the public" (3 NY2d at 635), whether the offenses themselves were matters of "public concern" or not. If "offenses against the public" is taken to mean serious criminal wrongdoing (which was at issue in *Brandt* itself), this broader reading of *Brandt* may be plausible. In this case, for example, if

defendants had truthfully accused plaintiff of larceny or possession of a controlled substance, a fair argument could be made that the communications, even if their subject matter was not of "public concern," would be absolutely privileged.

But it is completely unacceptable to extend the *Brandt* privilege to "offenses" as minor as adultery (a class B misdemeanor that is never prosecuted) or an omission from a resume. I see no basis in *Brandt*, or in the policies underlying it, for extending it to shelter the bad faith exposure of such relatively minor misconduct. The *Brandt* privilege should be held to protect, at most, communications about matters of public concern or about significant criminal activity. Because this case involves neither, *Brandt* does not apply and the complaint has correctly been allowed to stand.

Chief Judge LIPPMAN and Judges CIPARICK and JONES concur with Judge GRAFFEO; Judge SMITH concurs in result in a separate opinion in which Judge PIGOTT concurs; Judge READ concurs in result for the reasons stated in Part III of Judge SMITH's concurring opinion.

Order affirmed, etc.